**SIGNED THIS: June 17, 2009**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOHN A. LARSON, JR. and | ) | |
| ERIN M. LARSON, | ) | No.  07-81981 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| TRACEY WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adv. No.  07-8153 |
| | ) | |
| JOHN A. LARSON, JR. and | ) | |
| ERIN M. LARSON, | ) | |
| | ) | |
| Defendants. | ) | |

### O P I N I O N

This adversary proceeding is before the Court after trial on the Complaint filed by Tracey Woods, the Plaintiff (PLAINTIFF), against John and Erin Larson, the Debtors (individually, "JOHN" and "ERIN"; together, the "DEBTORS"), seeking a determination

that various loans made to the DEBTORS are nondischargeable under Section 523(a)(2)(A) of the Bankruptcy Code.

A chance encounter between the PLAINTIFF, a retired high school math teacher, and JOHN, one of his former students, and a pitch made by the PLAINTIFF to JOHN to join him in a business venture, resulted in the PLAINTIFF losing his life savings. In the summer of 2004, JOHN was working two jobs. While helping the PLAINTIFF load up the lumber he had purchased at his second job, at Anchor Lumber, the PLAINTIFF told him he had an opportunity that would be beneficial for him and his family. The PLAINTIFF was attempting to recruit JOHN into a multilevel marketing venture that he was part of.

Shortly after that encounter, the PLAINTIFF visited JOHN at his home and in response to the PLAINTIFF'S pitch to join the Amway network as one of his down-stream distributors, JOHN disclosed his financial difficulties. JOHN told the PLAINTIFF that the DEBTORS were behind in their house payments and the mortgagee was threatening foreclosure. The PLAINTIFF offered to loan the DEBTORS the money for a house payment, bringing cash to the DEBTORS' house. A couple of weeks later, in September, the PLAINTIFF loaned the money for a second house payment. Throughout the ensuing months, the PLAINTIFF made additional loans in order to enable the DEBTORS, so they said, to make additional house payments, truck payments, payments of utility bills, and to pay for the funeral expenses of JOHN'S father, who had passed away in the fall of 2003.

Concerned about the growing size of the undocumented loans, the PLAINTIFF asked JOHN to sign a written acknowledgment of the debt, which JOHN did, acknowledging that he owed the PLAINTIFF $26,000. Shortly thereafter, apparently

desiring more formality, the PLAINTIFF asked JOHN to sign a printed form of promissory note, which he did. The note, dated November 22, 2004, states JOHN'S promise to pay the principal sum of $26,000 plus interest at 5% per annum accruing from December 1, 2004. The space for stating the terms of repayment is left blank. Thereafter, JOHN continued to borrow money from the PLAINTIFF for various reasons. No payment on the loans was ever made by either of the DEBTORS. The PLAINTIFF brought suit against the DEBTORS in state court in 2005.

The DEBTORS filed a joint Chapter 7 petition on September 11, 2007. At the time of the filing of the petition, JOHN was unemployed. The DEBTORS' net monthly income, including food stamps of $700, was $2,019.41. While the DEBTORS noted a pending lawsuit against them by the PLAINTIFF in the Statement of Financial Affairs, they did not list him as a creditor on their schedules.[1] On October 24, 2007, after the first meeting of creditors, the DEBTORS filed an amendment to Schedule F, adding twenty claims, including a debt to the PLAINTIFF, listing the amount due as $75,000. The debt, shown as being jointly owed, is not listed as unliquidated or disputed.

The PLAINTIFF filed this adversary proceeding, seeking to have the debt declared nondischargeable pursuant to Section 523(a)(2)(A), alleging that through false pretenses, false representations or actual fraud, the DEBTORS obtained loans from him in the amount of $76,640.[2] While the DEBTORS deny engaging in fraud and contest the amount claimed by the PLAINTIFF, JOHN admits that the PLAINTIFF loaned him $40,000, admitting to the

---

[1] The record contains no evidence about the status or result of the state court lawsuit. PLAINTIFF does not contend that any issue was resolved in that suit that might collaterally estop its relitigation in this adversary proceeding.

[2] As filed, the complaint included claims under Sections 523(a)(4) and (a)(6). The PLAINTIFF voluntarily dismissed those claims at trial.

3

loans for sixteen house payments, $3,200 for electrical payments; $7,000 for an automobile accident, $4,500 for car payments and $4,500 for his father's funeral expenses. Alternatively, the DEBTORS contend that the representations which JOHN allegedly made concerned their financial condition and are not nondischargeable because they were not made in writing.  The matter was tried on February 19, 2009 and April 16, 2009.  JOHN testified on the first day of trial, but did not appear for the second day.  ERIN was present on both days, but she was not called as a witness, nor did she testify on her own behalf.

The PLAINTIFF, who appeared to be in his 70's, testified that he retired in 2000 and that he is in good health and has no problems with his memory.  He holds a masters degree in mathematics.  According to the PLAINTIFF'S testimony, after he made the second loan to enable the DEBTORS to make another house payment, JOHN represented that he and his brother were going to inherit several thousand (the complaint alleges 3,000) acres of farmland from his father.  JOHN told him that he was going to be receiving a large sum of money representing his one-half share of three-year's crop payments, which the tenant was holding until a dispute with the Environmental Protection Agency was resolved.  The PLAINTIFF testified that JOHN took him to the site and showed him the acreage which his late father allegedly owned.  The PLAINTIFF trusted JOHN and testified that he had no reason to disbelieve him.

In December, 2004, JOHN signed, at the PLAINTIFF'S request, a printed form of power of attorney, which the PLAINTIFF had prepared, appointing the PLAINTIFF as attorney in fact for JOHN, giving him the authority to endorse checks for payment into an unidentified account at Union Federal Savings and Loan Association and to make

withdrawals from that account. Two days later, JOHN signed a handwritten power of attorney, which the PLAINTIFF had also prepared, purporting to grant him authority "in all financial matters pertaining to me and my family."[3]

The PLAINTIFF continued to loan JOHN money, he says, in order to "protect his investment," meaning the amounts he had previously loaned. On one occasion, ERIN called the PLAINTIFF, telling him that the sheriff was at their home looking for JOHN, and that he would be arrested if a criminal fine resulting from a DUI was not paid immediately. The PLAINTIFF met ERIN and gave her $4,500. According to the PLAINTIFF, the loans were made to both JOHN and ERIN. On several occasions, ERIN would tell him about the late house payments.

Characterizing JOHN as an acquaintance, rather than a friend, the PLAINTIFF admitted that he never received a receipt from the DEBTORS for any of the loans nor did he independently verify any of the circumstances which precipitated the DEBTORS' need for large amounts of cash. While the PLAINTIFF was well aware of the DEBTORS' present precarious financial condition, he expected to be repaid from the crop proceeds.[4] According to the PLAINTIFF'S testimony, JOHN'S representations as to his inheritance and imminent crop payments were continuous during this period. Aside from the DEBTORS, the PLAINTIFF has never loaned money to anyone other than his son.

---

[3] The PLAINTIFF admitted that he likely signed ERIN'S name to that document. Neither power of attorney was acknowledged before a notary public or signed by witnesses. Cursory in nature, neither power of attorney was, in substance, anything close to the statutory form of an Illinois Power of Attorney for Property. The powers of attorney were never used for anything by the PLAINTIFF.

[4] Evidence was introduced at trial that JOHN also told the PLAINTIFF that he would repay him with proceeds from his workers compensation settlement. It was not clear, however, when JOHN was hurt or when this representation was made. Because this representation, even if made prior to some monies being loaned by the PLAINTIFF, is in the nature of a promise to do something in the future, it is not actionable under Section 523(a)(2). *See infra* p.9.

Colin Woods, the PLAINTIFF'S son, testified that in January, 2005, his father asked to borrow $3,000, in order that he could loan the money to JOHN. Upon learning the extent of his father's assistance, Colin called JOHN to check out the situation. JOHN assured him that he would repay the loans, telling him of his recent inheritance and the impending crop payments. When Colin found out in late January or early February that JOHN had told his father that he could not repay the loans because the money which he intended to pay the PLAINTIFF had fallen into a shredder and he injured his arm when he reached in after it, Colin called JOHN to tell him that he didn't believe his story and that he intended to check on the land ownership. Upon investigating the title to the real estate at the recorder's office, Colin discovered that JOHN'S father had owned only a small farm, consisting of seventeen acres. In April, 2005, recognizing that his father had little money left, Colin gave the PLAINTIFF $10,000, first extracting a promise that the funds would not be loaned to JOHN. Despite that promise, however, the PLAINTIFF also loaned those monies to JOHN.

According to JOHN, the PLAINTIFF stood ready to help the DEBTORS. All JOHN would do is relay his current financial plight and the PLAINTIFF would offer to bail the DEBTORS out. JOHN testified that there were times when he never even asked the PLAINTIFF for the money. JOHN could not say how much he had borrowed in all, but he was certain he did not agree to pay interest on any amount borrowed other than those loans memorialized by the promissory note. While he first denied that he had borrowed monies for litigation in connection with a car accident, truck payments and his father's funeral, he recalled those loans after his deposition testimony refreshed his recollection.

6

The figure of $75,000, listed in the amended schedules, was supplied to the DEBTORS upon their request to the PLAINTIFF'S state court attorney.[5]

Although he could not remember when it happened, JOHN testified that he crushed his arm in an accident while working at National Railway. He did not work for two years, eventually receiving a workers compensation settlement for $10,000. JOHN denies that he ever told the PLAINTIFF that he was going to inherit several thousand acres. He further denies making any representation regarding his ability to repay the loan from future crop payments to either the PLAINTIFF or to Colin. JOHN testified that he told the PLAINTIFF that the DEBTORS would be unable to repay him until they got back on their feet and that he later told Colin that he had no way to repay his father. JOHN testified that the PLAINTIFF had told him that becoming involved in Amway would change his family's life "all the way around." Despite the fact that the initial investment was only $112, JOHN did not become involved in the venture.[6]

**ANALYSIS**

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Matter of Scarlata*, 979 F.2d 521 (7th Cir. 1992). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To further the policy of providing a debtor a fresh start in

---

[5] Although, information set forth in a debtor's schedules may be treated as a judicial admission, that rule is neither hard nor fast, and debtors are usually permitted to explain why scheduled information may not be correct. *In re Arcella-Coffman*, 318 B.R. 463, 476 (Bankr.N.D.Ind. 2004); *In re Boggess*, 105 B.R. 470, 474 (Bankr.S.D.Ill. 1989). Under the circumstances, it is not appropriate to treat information received from a litigation adversary, accepted blindly by the DEBTORS, as a judicial admission.

[6] According to the PLAINTIFF, in the fall of 2004, JOHN made two small deliveries of Amway products to his work place, having sold some excess products to his co-employees under the PLAINTIFF'S name.

bankruptcy, exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994).

Section 523(a)(2) of the Bankruptcy Code provides as follows:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt–
> * * *
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>> (B) use of a statement in writing –
>>> (i) that is materially false;
>>> (ii) respecting the debtor's or an insider's financial condition;
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and
>>> (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2).

This exception to discharge is comprised of two separate parts. The first component, Section 523(a)(2)(A), excepts from discharge a debt for obtaining money or property by false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(A).[7] The second component, Section 523(a)(2)(B), excepts only written statements "respecting a debtor's . . . financial condition." The DEBTORS contend that the representations constitute statements regarding their financial condition, which must be in writing in order to render a debt nondischargeable.

---

[7]The scope of this provision, which specifically excepts debts arising out of "false pretenses, false representation or actual fraud," is not limited to frauds involving misrepresentations or misleading omissions. *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000). Rather, the exception encompasses "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another." In this case, the PLAINTIFF is relying on specific representations made by JOHN, and the traditional analysis applies.

8

Courts are divided whether the exception for statements respecting the debtor's financial condition should be interpreted broadly or narrowly. *See In re Bogdanovich*, 292 F.3d 104, 112-13 (2d Cir. 2002)(collecting cases). In *In re Cassel*, 322 B.R. 363 (Bankr.C.D. Ill. 2005), this Court considered the issue, finding that a narrow interpretation of the term, limiting such statements to financial-type statements, such as balance sheets, income statements or similar documents from which an entity's overall financial picture could be ascertained, was in keeping with the legislative history of the provision. *Accord, In re Joelson*, 427 F.3d 700 (10th Cir. 2005). Under this interpretation, a debtor's oral misrepresentation about the ownership, value, or condition of a single asset or a misrepresentation concerning a single aspect of the equation of the debtor's assets/income/liabilities is actionable under Section 523(a)(2)(A). Neither of JOHN'S allegedly false representations reflect the DEBTORS' overall net worth or overall financial condition.

The Court reaffirms its reasoning set forth in *Cassel* and determines that none of the representations made by JOHN were of a kind "respecting the debtor's or an insider's financial condition," as that phrase is used in Section 523(a)(2)(B). Therefore, the DEBTORS' contention that the oral representations are not actionable is baseless and must be rejected. It is undisputed that misrepresentations do not have to be in writing to be actionable under Section 523(a)(2)(A). *In re Chryst*, 177 B.R. 486, 493 (Bankr.E.D.Pa. 1994).

At trial, the DEBTORS portrayed the alleged misrepresentations as promises of future action. A false representation must encompass a statement that falsely purports to depict current or past facts and cannot entail a promise to perform in the future, unless the

debtor made the promise with an existing intention of never performing. *Matter of Allison*, 960 F.2d 481 (5th Cir. 1992); *In re Demar*, 373 B.R. 232 (Bankr.E.D.N.Y. 2007); *In re Alicea*, 230 B.R. 492 (Bankr.S.D.N.Y. 1999). The alleged misrepresentations made by JOHN were knowing misrepresentations of prior facts: that he had inherited several thousand acres upon his father's death in November, 2003, and that he was entitled to receive a significant crop payment, the receipt of which was tied up pending resolution of an EPA matter. The PLAINTIFF was not simply relying on a general promise by the DEBTORS to repay the loan. Rather, JOHN made representations about two specific sources of repayment, to which he claimed to have a presently existing entitlement. Thus, the dischargeabilty of PLAINTIFF'S claim stands or falls on whether JOHN'S statements are false representations under the traditional analysis of Section 523(a)(2)(A). The DEBTORS' contention that the misstatements were merely promises of future action is not supported by the evidence.

Where a creditor's claim of nondischargeability is based on a false representation, the court's analysis contains the following elements: (1) the debtor made a representation to the creditor; (2) the debtor's representation was false; (3) the debtor possessed *scienter*, i.e., an intent to deceive; (4) the creditor relied on the debtor's misrepresentation, resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Because a debtor rarely admits an intent to deceive, the element of intent may be inferred based on the totality of circumstances. *In re Young*, 91 F.3d 1367 (10th Cir. 1996); *In re Radcliffe*, 317 B.R. 581 (Bankr.D.Conn. 2004); *In re Abraham*, 247 B.R. 479 (Bankr.D.Kan. 2000). Proof of intent to deceive is measured by the debtor's subjective intent at the time the representation was made. *In re Monroe*, 304 B.R.

10

349 (Bankr.N.D.Ill. 2004). Intent to deceive can be inferred when a person knowingly makes a false representation which that person knows or should know will induce another to make a loan. *Matter of Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995) (quoting *In re Kimzey*, 761 F.2d 421, 424 (7th Cir. 1985)).

The Court has little difficulty finding that the PLAINTIFF established that JOHN made false representations. The PLAINTIFF was a credible witness and the Court accepts his testimony regarding JOHN'S statements concerning his inheritance and his entitlement to crop proceeds. In contrast, both JOHN'S demeanor during his examination (he was evasive, contradictory and displayed a selective memory) and his recanted testimony cast serious doubt upon his credibility. This Court further finds that JOHN made those representations, beginning after the first two loans, throughout the period the loans were being made, and that those false representations were made by JOHN with the intent to deceive the PLAINTIFF and to induce him to continue to make loans to the DEBTORS. This conclusion is compelled by the magnitude of his misrepresentations. Turning 17 acres of land into several thousand acres is hardly a minor falsehood. JOHN claimed to be entitled to three years' crop payments, not just one, when he was actually owed nothing.

The Court finds that beginning with the third loan and up to the time of the final loans made after April 4, 2005, the PLAINTIFF actually relied on JOHN'S false statements. But reliance on a false pretense or false representation under Section 523(a)(2)(A) must be "justifiable." *Field v. Mans*, *supra*. The standard of justifiable reliance, in between reasonable reliance and reliance in fact, imposes no duty to investigate unless the falsity of the representation is readily apparent. *Id*. at 70-72, 116 S.Ct. at 443-445. Justifiability,

11

unlike reasonableness, is not measured by an objective standard, but depends on the qualities and characteristics of the particular creditor. *In re Basel-Johnson*, 366 B.R. 831 (Bankr.N.D.Ill. 2007); *In re Scott*, 294 B.R. 620 (Bankr.W.D.Pa. 2003). "Blind" reliance, of course, is unavailing. *In re Freier*, 402 B.R. 891 (8th Cir.BAP 2009).

Justifiable reliance is a less exacting standard than reasonable reliance, which focuses on whether reliance would have been reasonable to the hypothetical average person. The Restatement (Second) of Torts (1976), addressing justifiable reliance, sets forth a pertinent example of a seller of land who misrepresents that the parcel is free of encumbrances. According to the Restatement, the buyer's reliance on the factual representation is "justifiable," even if he could have easily searched for liens at the recorder's office. The Supreme Court recounted this example with approval in its discussion on justifiable reliance. *Field v. Mans,* 116 S.Ct. at 444.

This Court concludes that the PLAINTIFF has satisfied the justifiable reliance standard. While the PLAINTIFF is a man of education, he was not sophisticated in financial matters. A mastery of figures does not necessarily carry over to one's personal finances. The PLAINTIFF kept a large sum of money in a safe at home. In an attempt to shore up his position with the DEBTORS, he drafted two incomplete promissory notes and two wholly ineffective powers of attorney. He never sought the assistance of an attorney.

Neither was the PLAINTIFF'S reliance blind. He went with JOHN and viewed what he was told was the acreage that JOHN was inheriting and that was being farmed by a tenant farmer.[8] In light of *Field v. Mans,* the fact that PLAINTIFF could have but did not

---

[8] It is difficult to give credence to the argument of one who commits fraud that his victim should not have been so gullible. JOHN did more than just use words to beguile the PLAINTIFF. He played upon the PLAINTIFF'S sympathies and strung him along with ERIN'S occasional assistance and he corroborated his misrepresentations with visual

12

research title to the farmland or examine the state court records for a probate case does not destroy the justifiability of his reliance. But once the PLAINTIFF learned in April, 2005, as a result of Colin's investigative efforts, that JOHN'S father owned only a small parcel of land, his reliance thereafter was no longer justifiable.

Having determined that the PLAINTIFF has proved the elements of Section 523(a)(2)(A), it remains for the Court to determine the amount owed to the PLAINTIFF and what portion is nondischargeable. *Matter of Hallahan*, 936 F.2d 1496, 1508 (7th Cir. 1991); *In re Orseno*, 390 B.R. 350 (Bankr.N.D.Ill. 2008). The PLAINTIFF claims that he loaned the DEBTORS a total of $74,650, to which he adds $1,000 for interest charges he incurred in refinancing his truck and $1,000 for income taxes he incurred as a result of withdrawals from his individual retirement account. After emptying his personal safe of a large amount of cash, the PLAINTIFF refinanced his truck and gave the DEBTORS $9,000. The PLAINTIFF also withdrew $13,150 from his individual retirement account. In addition to submitting into evidence documents in support of the refinancing and retirement account withdrawals, the PLAINTIFF introduced copies of his check register, checking account statements and statements on his credit union account, to substantiate the following loans to the DEBTORS:

| Date | Source | Amount |
|---|---|---|
| November 15, 2004 | Credit union account (Service Plus) | $1,500.00 |
| November 18, 2004 | Credit union account | 1,100.00 |
|  | Credit union account | 100.00 |
| February 23, 2005 | Checking account (Union Federal) | 450.00 |
| March 8, 2005 | Checking account | 7,000.00 |

---

"proof" of the farm acreage. He spun the same yarn to Colin, as well.

13

   April 27, 2005      Checking account      5,000.00
   May 7, 2005       Checking account      3,500.00

The statement on the credit union account shows withdrawals made on the dates and the amounts indicated above. Notations on the check register show amounts paid to JOHN of $900 on November 1, 2004; $7,500 on January 8, 2005; $3,100 on January 25, 2005; $450 on February 23, 2005; $7,000 on March 8, 2005; $3,150 on April 4, 2005; $5,000 on April 24, 2005; and $3,500 in May, 2005. Copies of the bank statements, through May 5, 2005, show withdrawals of cash of $9,700 and $900 on November 1, 2004; $7,500 on January 11, 2005; and $3,150 on April 20, 2005.

  The evidence of the various amounts loaned, however, was presented in scattershot fashion. The PLAINTIFF kept no log of the amount and date of each loan. At trial, he testified mainly from memory, which was admittedly imperfect. He supplemented his memory with bank account records, his check register and a written itemization. The evidence is presented in three streams. First, by way of bank account records. Second, by description of the source of the funds (Met Life IRA, Pickup Truck loan, cash in safe, etc.). Third, by what JOHN used the loan for (house payments, father's funeral expenses, DUI fines, payments to brother, etc.). The difficulty is that the three streams overlap. For example, the PLAINTIFF may have obtained funds from his IRA, deposited them in a bank account, and then lent them to JOHN for house payments. The same funds may thus appear in all three streams, opening the door to double or triple counting. The PLAINTIFF bears the burden to prove the amounts loaned – any uncertainties or conflicts in the evidence must be construed against him.

The form promissory note for $26,000 signed by JOHN is dated November 22, 2004. The PLAINTIFF testified that this note was signed after the handwritten note, which is dated December 6, 2004. The Court concludes that the $2,700 withdrawn from the credit union in November, 2004, was included in this amount, given the PLAINTIFF'S testimony that the note was intended to memorialize the existing indebtedness. Section 523(a)(2)(A) excepts from discharge a debt "to the extent obtained by" a false representation. Nondischargeability is limited to the portion of the debt directly attributable to the false representations. Here, it is not disputed that the first two loans were made by the PLAINTIFF prior to the false representations being made. Both loans were to enable the DEBTORS to make their regular house payment, in the amount of $850 each. So the initial amount evidenced by the $26,000 note amount must be reduced by $1,700, leaving the balance of $24,300 nondischargeable.

The evidence also supports the determination that the following amounts were loaned to JOHN by the PLAINTIFF in reliance upon JOHN'S misrepresentations: $7,500 on January 8, 2005; $3,100 on January 25, 2005; $450 on February 23, 2005; $7,000 on March 8, 2005; and $3,150 on April 4, 2005. These loans are nondischargeable.

In addition, Colin testified that he gave the PLAINTIFF $10,000 in April, 2005. According to the PLAINTIFF'S checking account statement, a check for $9,000 was deposited on April 12, 2005, bringing the checking account balance to $13,565.01. Because the last few loans made on or after that date, were most certainly made with knowledge of the likely falsity of JOHN'S representations, those amounts are not nondischargeable. Accordingly, this Court finds that only a portion of the total prepetition debt owed to the PLAINTIFF by JOHN is nondischargeable, in the amount of $45,500.

15

The determination that JOHN'S debt to the PLAINTIFF is nondischargeable based upon his false representations does not bind ERIN. Courts have uniformly held that fraud cannot be imputed to a spouse based on the marital relationship alone. *In re Aguilar*, 2009 WL 146155 (Bankr.D.N.M. 2009); *In re Cooper*, 399 B.R. 637 (Bankr.E.D.Ark. 2009); *In re Antonious*, 358 B.R. 172 (Bankr. E.D. Pa. 2006). Rather, courts have required a partnership or agency relationship or that the spouse knowingly aided and abetted in the fraud or misrepresentation. *Antonious*, 358 B.R. at 184-85. No evidence was introduced to establish that ERIN made any false representations to the PLAINTIFF. The PLAINTIFF did not testify that ERIN was present when JOHN made the misrepresentations or that he discussed the source for the repayment of the loans with her. If he had, and ERIN had then made no effort to inform the PLAINTIFF as to the truth, a different result may occur. Even though ERIN requested at least one of the loans and that she was at times the recipient of the funds, the PLAINTIFF testified that ERIN never agreed to repay the loans. Her signature does not appear on the promissory note. Moreover, no evidence was introduced as to her role in the family finances. She was present both days of trial but was not called as a witness. Therefore, the Court concludes that the PLAINTIFF has not carried his burden of proof against ERIN.

To the extent the PLAINTIFF is entitled to interest as a matter of state law, such interest, both prepetition and postpetition, is also nondischargeable. *See In re Burke,* --- B.R. ----, 2009 WL 1609035, at p.19 (Bankr.N.D.Ill. 2009). The promissory note provides for interest at 5% per annum from December 1, 2004. Therefore, interest will accrue at that

rate on the sum of $24,300 as provided in the note. PLAINTIFF is entitled to interest at 5% per annum on the remaining balance of $21,200 pursuant to the Illinois Interest Act, which allows interest to a creditor for all monies after they become due "on money lent or advanced for the use of another." 815 ILCS 205/2. The Court determines that the loans became due and payable no later than June 1, 2005, so interest will accrue from that date. The accrual of prejudgment interest runs through the date of judgment. PLAINTIFF is awarded prejudgment interest in the amount of $9,812.02 and is entitled to judgment against JOHN in the total amount of $55,312.02.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###